IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Bobby Brooker (N-74396), ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 18 C 50111 |
| v. ) | |
| ) | |
| James Abate, *et al.*, ) | Hon. Iain D. Johnston |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bobby Brooker, an Illinois state prisoner, brought this action *pro se* pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Defendants, Winnebago County Sheriff Deputies James Abate and Jacob Marino, violated his constitutional rights in connection with the execution of a search warrant in his apartment on December 12, 2017. Before the Court is Defendants' motion for summary judgment. For the reasons set forth below, Defendant's motion [43] is granted.

**I.    Northern District of Illinois Local Rule 56.1**

Plaintiff is proceeding *pro se* and Defendants therefore served him with a "Notice to Pro Se Litigants Opposing Summary Judgment" [47] that explains how to respond properly to a motion for summary judgment and statement of material facts under Federal Rule of Civil Procedure 56 and Local Rule 56.1. Under the Court's Local Rules, a moving party must provide "a statement of material facts as to which [it] contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)).

In response to Defendants' Statement of Facts (SOF) [45], Plaintiff filed an affidavit [52] in which he disputes some of the statements in Deputies Marino and Abate's affidavits.[1] In their reply, Defendants assert that "several of [Plaintiff's] 'disputed material facts' in which [Plaintiff] contests [Defendants'] affidavits either cite exhibits not in the evidentiary record or do not cite the record at all." [54 at pg. 3.] Defendants therefore assert that the Court should not consider Plaintiff's statements in his affidavit. [*Id.*] On August 20, 2020, after Defendants had already replied to Plaintiff's affidavit, the Court gave Plaintiff an opportunity to address the exhibit issue by allowing him to supplement his affidavit with the exhibits referred to therein (or otherwise clarify the references). [*See* 58.] Plaintiff submitted two separate supplements [59][60]; neither of these documents are responsive to the Court's August 20, 2020 order, as they do not attach or

---

[1]    In support of their motion for summary judgment, Defendants have offered the following evidence: Plaintiff's deposition testimony [45-1], the affidavit of Deputy James Abate [45-2], and the affidavit of Deputy Jacob Marino [45-3].

1

otherwise explain the exhibits referenced in Plaintiff's earlier-filed affidavit. Because Plaintiff is proceeding *pro se*, notwithstanding the deficiencies in his compliance with Rule 56.1, the Court has interpreted his responses (in his affidavit) generously and will construe them as favorably as the record and Local Rule 56.1 permit, to the extent that he has pointed to admissible evidence in the record that corresponds to Defendants' facts or could properly testify himself about the matters asserted. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013); Fed. R. Evid. 602. Further, the Court takes account of Plaintiff's deposition testimony, including portions not mentioned in Defendants' Statement of Facts. *See Bentz v. Hardy*, 638 F. App'x 535, 536 (7th Cir. 2016) (unpublished) (holding that plaintiff's failure to properly respond to Defendants' Rule 56.1 Statement was not fatal where defendants principally relied on his deposition testimony in support of their motion.).

With these principles in mind, the Court turns to the relevant facts.

## II.     Factual Background

At all times relevant to the second amended complaint, Plaintiff Bobby Brooker ("Plaintiff" or "Brooker") resided on the lower floor in a two-apartment building in Rockford, Illinois. [45 (SOF) at ¶ 1.] Defendants James Abate ("Abate") and Jacob Marino ("Marino") were, at all relevant times, Sheriff Deputies employed by the Winnebago County, Illinois Sheriff's Department. [*Id.* at ¶ 2.]

*Events Leading up to the Search*

On December 11, 2017, Deputy Abate obtained a search warrant to search Brooker's apartment. [*Id.* at ¶ 5.] Deputy Abate had received information from a confidential informant that someone name "Bobby" was selling crack cocaine from inside the apartment where Brooker resided and that a "vicious pit bull" inside the apartment was "being used as a guard dog." [*Id.* at ¶ 6.] Plaintiff testified at his deposition that he used the dog to "deter people" from "crawling in through [his] back window." [45-1 at pg. 13:4-9.]

Deputy Abate decided not to involve the Winnebago County Animal Services Department in the execution of the search warrant for the following reasons. [45 at ¶ 7.] First, the narcotics unit often encounters armed subjects while executing search warrants for illegal drugs and because Animal Services personnel are not trained, or equipped to deal with armed subjects, he did not want to put Animal Services personnel in harm's way. [*Id.* at ¶ 8.] Second, knock-and-announce entries in drug raids generally are fairly rapid to quickly secure anyone inside the residence. The element of surprise is important as the police do not want to give anyone inside the residence time to potentially secure a weapon, and arrangements with Animal Services may have raised suspicion, alerted Plaintiff or others that something was amiss, or allowed Plaintiff or other suspects to depart the premises, destroy evidence, or formulate plans for an attack against the deputies. [*Id.* at ¶ 9.] Third, Animal Services personnel are not trained in room-clearing tactics, securing people, or securing a building. [*Id.* at ¶ 10.]

*The December 12, 2017 Search of Plaintiff's Apartment*

On December 12, 2017 (the day after obtaining the search warrant), at approximately 9:38 a.m., nine members of the Winnebago County Sheriff Department's Narcotics Unit, including Deputy Abate and Deputy Marino, executed the warrant. [*Id.* at ¶ 11.] Deputy Marino was assigned a Sheriff's Department-issued shotgun for the entry if the pit bull posed an immediate danger to him or other members of the narcotics unit. [*Id.* at ¶ 12.]

As members of the search warrant team approached the back of Plaintiff's apartment, they encountered a female leaving the apartment, who was detained and later released. [*Id.* at ¶ 13.] One of the deputies of the Narcotics Unit knocked on the back door of Plaintiff's apartment and loudly announced the presence of police, stated that they had a search warrant, and ordered anyone in the apartment to open the door. [*Id.* at ¶ 14.] No one responded so the deputy again knocked on the back door and loudly made the same announcements. [*Id.* at ¶ 15.] When the deputy received no response, he breached the back door with a battering ram. [*Id.* at ¶ 16.]

When the deputies first entered Plaintiff's apartment, Plaintiff was listening to music in his living room with a woman and had just lit or was about to light a "bowl of marijuana." [*Id.* at ¶ 17.] Deputy Marino entered the apartment's kitchen from a rear enclosed porch and immediately heard a dog "aggressively" and "consistently" barking inside the apartment. [*Id.* at ¶¶ 18-19.] As he entered the kitchen, he observed an unleashed, large pit bull weighing approximately 70 pounds standing in the living room barking aggressively at him. [*Id.* at ¶¶ 20-21.] Deputy Marino advised the other deputies the pit bull was in the living room. [*Id.* at ¶ 22.]

As Deputy Marino walked from the kitchen to the living room, he saw the pit bull growling and baring its teeth. [*Id.* at ¶ 24.] The pit bull then went into a south bedroom adjacent to the living room and continued to aggressively bark at Deputy Marino. [*Id.* at ¶ 25.] For the safety of the deputies in the search warrant team, including himself, Deputy Marino kept watching the pit bull. [*Id.* at ¶ 26.] He observed furniture in the south bedroom, including a bed. [*Id.* ¶ 27.] He did not know if there was anyone hiding in the south bedroom, and so he went to "sweep it" for officer safety reasons and so that it could be cleared to search for illegal drugs. [*Id.* at ¶ 28.]

As Deputy Marino approached the door of the south bedroom, the pit bull continued to bark aggressively and charged at him. [*Id.* at ¶ 29.] Fearing attack as the pit bull closed to within approximately 4 to 5 feet, Deputy Marino fired one shotgun round and struck the pit bull. [*Id.* at ¶ 30.] The pit bull then jumped on the bed and, while still aggressively barking, lunged at Deputy Marino from the bed. [*Id.* at ¶ 31.] When the pit bull was approximately 3 feet away, Deputy Marino again feared that he would be attacked and thus fired a second shotgun round, which struck the pit bull and proved fatal. [*Id.* at ¶¶ 32-33.]

When the deputies first entered the apartment while executing the search warrant, Deputy Abate walked outside from the apartment's back door to the front of the apartment to see if anyone had tried to leave through the apartment's front door. [*Id.* at ¶ 39.] As Deputy Abate walked around the outside of the apartment, he heard a dog "loudly and constantly barking" inside the apartment followed by gunshots. [*Id.* at ¶ 40.] Deputy Abate was outside when the pit bull was shot. [*Id.* at ¶ 41.]

Stepping back briefly in time, Plaintiff first saw Deputy Marino as Marino walked from the kitchen to the living room. [*Id.* at ¶ 23.] At this time, Plaintiff was sitting on a couch that faced west in his living room (toward the TV); he testified that he did not know where his pit bull was located and that the last time he saw him, the pit bull was in the south bedroom. [*Id.* at ¶ 34.] Because Deputy Marino was armed with a shotgun, Plaintiff testified that he "didn't take my [Plaintiff's] eyes off of him [Marino]." [*Id.* at ¶ 35.] Plaintiff testified that when Deputy Marino was located at the entry way of the south bedroom, he "pivoted to see what Cezar [the pit bull] was doing," and "was looking to see where Cezar was at," when Deputy Marino fired his first shot. [*Id.* at ¶ 36.] Plaintiff testified that the first time Deputy Marino shot Cezar, "the only thing [Plaintiff] could see" of his pit bull "was the tip of [his] dog's nose that was coming out from the other side of the dresser." [*Id.* at ¶ 37.] Plaintiff testified further that he did not see Cezar being shot the second time, because after the first shot, his eyes "instantly filled with water [tears]." [*Id.* at ¶ 38.]

When Deputy Marino and other deputies first entered the apartment, Plaintiff was bare-chested, was wearing only pants and socks, and the heat in the apartment was on. [*Id.* at ¶¶ 42-43.] During the search, Plaintiff did not go outside and he was given a jacket before he was taken outside to a squad car. [*Id.* at ¶¶ 45-46.] After Plaintiff was arrested and placed in a squad car, he was taken directly to the Winnebago County Jail and during booking, he did not complain about frostbite or say that he was experiencing hypothermia symptoms. [*Id.* at ¶ 47.]

As part of normal operating procedures of the Winnebago County Sheriff's Department when executing a search warrant, a Sheriff's Deputy took Plaintiff's photograph. [*Id.* at ¶ 48.] While photographed, Plaintiff was dressed the same as when deputies first entered his apartment – he was wearing pants and socks, and was bare chested. [*Id.* at ¶ 49.] Plaintiff testified that he has never seen the photograph outside of the discovery process in his criminal case and the instant civil case. [*Id.* at ¶ 50.]

During the search of Plaintiff's apartment, deputies found 0.5 grams of a white chunky substance that later field-tested for cocaine in a nightstand drawer. [*Id.* at ¶ 51.] Also located in the drawer were a variety of pills consisting of Carisoprodol, Zolpidem Tartrate, Oxycontin and Methadone Hydrochloride. [*Id.* at ¶ 52.] Deputies also located 13.1 grams of methadone in the pocket of a jacket that was in the kitchen of Plaintiff's apartment. [*Id.* at ¶ 53.]

Plaintiff was charged under Illinois law with three drug-related felonies – possession with intent to deliver less than one gram of cocaine being within 1000 feet of a drug free zone (a church); possession with intent to deliver methadone; and possession with intent to deliver Carisoprodol. [*Id.* at ¶ 54.] On April 3, 2019, Plaintiff plead guilty in Illinois state court to one felony – possession with intent to deliver cocaine. [*Id.* at ¶ 55.] Plaintiff was sentenced to six years in prison and is currently incarcerated at Shawnee Correctional Center. [*Id.* at ¶ 56.]

The Winnebago County Sheriff's Department maintains a "Use of Force" written policy, General Order Number: 5-001.1, which provides, in part, the following sections:

4

>   II.   PURPOSE
>
>   The purpose of this directive is to establish specific guidelines and procedures concerning the use of force by officers of the Winnebago County Sheriff's Department, whether on-duty or off duty. This policy is intended to limit an officer's ability to use force, including deadly force, when and if the proper circumstances exist. The officer is expected to retain the right to defend him/herself and others with as much force as is objectively reasonable to affect such defense.
>
>   . . . .
>
>   VII.   DEADLY FORCE
>
>   A. An officer may use deadly force only when the officer reasonably believes that the action is in defense of human life, including the officer's own life, or in defense of any other person (including the officer) in imminent danger of serious physical injury. An officer shall use reasonable alternatives, IF SUCH ARE AVAILABLE AND FEASIBLE . . . . (emphasis in original)
>
>   . . . .
>
>   E. ….The destruction of vicious animals follows the same rules as set forth for self-defense and the defense and safety of others.

[*Id.* at ¶ 57.]

### III.   Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). If the non-moving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' summary judgment must be granted." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797-98 (7th Cir. 2017) (citation omitted).

**IV.	Analysis**

    **A.	Plaintiff's Second Amended Complaint**

At the outset, the Court observes that Plaintiff's second amended complaint challenges certain events that occurred on December 12, 2017 when police searched his apartment pursuant to a warrant. [*See* 9.] According to the allegations in the second amended complaint, Plaintiff's dog was fatally shot during the execution of the search warrant. [*Id.*] Upon the initial review of the second amended complaint, the Court found that, while Plaintiff's second amended complaint was thinly-pled, his allegations were sufficient to state a Fourth Amendment claim against Winnebago County Sheriff Deputies James Abate (who was allegedly involved with procuring the search warrant and who was present during the execution thereof) and Jacob Marino (who was allegedly involved with the execution of the search warrant and who was responsible for shooting Plaintiff's dog). [*See* 8 at pg. 2.] The Fourth Amendment claim stemming from the shooting of the dog during the execution of the search warrant was the only claim Plaintiff appeared to be raising and which he was permitted to proceed upon. [*See id.*]

Defendants have moved for summary judgment on Plaintiff's Fourth Amendment claim stemming from the shooting (the seizure) of the dog. [44 at pgs. 9-12.] They have also moved for summary judgment on Plaintiff's "other constitutional claims" stemming from his allegations in the second amended complaint concerning his alleged inability to cover himself with a shirt or jacket during the search, the fact that his picture was taken, and based on the exchange of certain personal information at the time of the search.[2] [*Id.* at pgs. 12-14.]

To be clear, Plaintiff was not permitted to proceed upon any other claim in this lawsuit except for his Fourth Amendment claim stemming from the shooting (seizure) of his property (his dog). The Court did not find that Plaintiff's second amended complaint stated any other federal claim given that he did not allege facts that called into question the legality of the search, the search warrant, or his arrest.[3] Thus, the Court confines its analysis to the Fourth Amendment claim against Deputies Marino and Abate stemming from the shooting (seizure) of Plaintiff's dog.

    **B.	Plaintiff's Fourth Amendment Claim Related to the Seizure of his Dog**

"[T]he Fourth and Fourteenth Amendments provide a remedy when a citizen's property is unreasonably damaged during a search." *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) ("Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." (citing *United States v. Ramirez*, 523 U.S. 65, 71 (1998))). Because "domestic animals are 'effects' within the meaning of the Fourth Amendment[,]" the "unnecessary killing of

---

[2] More specifically, Plaintiff alleged that Deputy Abate "refused to allow [him] to cover [his] partly naked body[.]" [9 at pg. 4.] Plaintiff alleged that it was cold in the apartment because the door had been "busted[.]" [*Id.*] He alleged that he asked for a shirt or jacket because he was "shaking from the cold" and also "felt degraded being partly nude in front of females." [*Id.*] He alleged further that "[his] picture was taken [and] info was exchanged, etc." [*Id.*] In the concluding portion of his pleading, Plaintiff stated as follows: "I suffered a deprivation of my rights of personal liberty, personal dignity and unjustified invasion of seclusion, unreasonable seizure." [*Id.*]

[3] This is consistent with the now developed record, which shows why the search was conducted, how the search was conducted, what was found during the search, and why (and how) Plaintiff was taken into custody/arrested.

a person's pet offends the Fourth Amendment." *Viilo v. Eyre*, 547 F.3d 707, 711 (7th Cir. 2008) (citing *Siebert v. Severino*, 256 F.3d 648, 656 (7th Cir. 2001) ); *see also Phillips v. City of Chicago*, 2013 WL 4779185, at *1 (N.D. Ill. 2013) (" . . . a police officer who unreasonably kills or maims a person's pet violates that person's Fourth Amendment rights."). "[T]he use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." *Viilo.* 547 F.3d at 711 (citing *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210-11 (3d Cir. 2001)); *cf. Saathoff v. Davis*, 826 F.3d 925, 933 (7th Cir. 2016) (confirming that the test in *Viilo* applies when police officers shoot a dog at the owner's house while the owner is present, while also indicating that the test does not fit a situation involving a fight between two dogs).

Viewing the evidence in a light most favorable to Plaintiff, no reasonable jury could find that Deputy Marino acted unreasonably by shooting Plaintiff's dog during the search. The record shows that on December 11, 2017, Deputy Abate obtained a warrant to search Plaintiff's apartment. [45-2 at ¶ 7.] Deputy Abate had received information from a confidential informant that someone named "Bobby" was selling crack cocaine from inside the apartment and was using a "vicious pit bull" as a "guard dog." [45-2 at ¶¶ 3-5.] Plaintiff testified at his deposition that he used the dog to "deter people" from "crawling in through [his] back window." [45-1 at pg. 13:4-9.]

Deputy Marino was assigned a Sheriff's Department-issued shotgun in case the pit bull posed an immediate danger to him and/or the members of the Narcotics Unit. [45-3 at ¶ 5.] Deputy Marino was the first deputy to enter Plaintiff's apartment. [45-3 at ¶ 8.] Shortly after he did so, he encountered a "unleashed" and "large" pit bull "standing in the living room aggressively barking at [him]." [*Id.* at ¶ 9.] When Deputy Marino walked from the kitchen toward the living room, he "observed the pit bull growling and baring its teeth." [*Id.* at ¶ 11.] The pit bull then moved into a south bedroom and continued to bark. [*Id.* at ¶ 12.] According to Deputy Marino's sworn statement, he needed to keep watching the pit bull "[f]or the safety of the deputies in the search warrant, including [him]self." [*Id.* at ¶ 13.] Deputy Marino observed furniture in the south bedroom, including a bed, and, not knowing if anyone was hiding in the south bedroom, he decided to "sweep" it (for officer safety and so that it could be cleared to search for illegal drugs). [*Id.* at ¶¶ 14-15.] When Officer Marino approached the bedroom door, the dog, while still aggressively barking, charged at him, closing within four to five feet. [*Id.* at ¶¶ 16-17.] Deputy Marino shot the pit bull to prevent it from attacking him. [*Id.* at ¶ 17.] The pit bull jumped up on the bed and then lunged off the bed at Deputy Marino who was approximately three feet away. [*Id.* at ¶¶ 18-19.] At this point, Deputy Marino shot the pit bull a second time, for fear of being attacked. [*Id.* at ¶¶ 19, 20.] This evidence suggests that the pit bull -- which Deputy Marino describes as being unsecured, large in size, and acting aggressively towards him in the moments before each shot was fired -- posed an immediate threat to Deputy Marino's safety and that the use of force was unavoidable under the circumstances.

Plaintiff attempts to create a genuine issue of material fact as to whether the dog acted aggressively toward Deputy Marino by asserting in his affidavit that the dog did not charge, did not bark, and did not specifically "jump[] on [the] bed or lunge off the bed." [52 at pg. 4.] However, Plaintiff expressly testified at his deposition that when the deputies first entered his apartment, he was listening to music in his living room and had just lit or was about to light a

7

"bowl of marijuana." [45-1 at 45:20-24; 46:1-21.] He testified further that when he first saw Deputy Marino in his apartment, he was sitting on a couch that faced west in his living room (toward the TV), and that he did not know where his dog was located. [*Id.* at 58:5; 59:12; 62:3-6.] He also testified that, while still sitting facing west on the couch in the living room (when Deputy Marino was located at the entry way of the south bedroom), he "pivoted to see what Cezar [the dog] was doing," and "was looking to see where Cezar was at," when Deputy Marino fired his first shot at the pit bull. [*Id.* at 71:9-20; 77:14-24.] He testified further that when Deputy Marino fired the first shot, "the only thing [he] could see" of his pit bull "was the tip of [his] dog's nose that was coming out from the other side of the dresser." [*Id.* at 69:18-23.] And, Plaintiff testified that he did not see his pit bull when it was shot for the second time, because after the first shot, his eyes "instantly filled with [tears]." [*Id.* at 72:23; 73:5; 73:23; 74:5; 75:7-16.] Plaintiff cannot avoid summary judgment by submitting an affidavit that contradicts clear answers to unambiguous questions. *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1170 (7th Cir. 1996).

Given that Plaintiff did not clearly see the dog the first time it was shot and did not see the dog the second time it was shot, his statements about the dog's behavior are insufficient to create a genuine issue of material fact as to whether the dog was menacing Deputy Marino when it was shot. *See Williams v. Voss*, 2011 WL 4340851, at *4 (D. Minn. Sept. 15, 2011) (no genuine issue of fact about whether dog was aggressive where officer's "sworn affidavits stat[ed] that the dog charged at them aggressively" and husband/wife plaintiffs had "no specific evidence to refute that assertion" because they could not see the family dog at the time it was shot); *see also Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 570 (6th Cir. 2016) (finding that the seizure of two dogs was reasonable where there was unrebutted testimony that the dogs behaved in a manner threatening to officers' safety, including lunging and barking at the officers).

Plaintiff also seeks to avoid summary judgment by arguing that Defendants failed to adequately plan for the dog's presence. [52 at pg. 5.] In a section of his affidavit captioned "Unnecessary Use of Force," Plaintiff states that "both officer . . . Abate[] and Officer Marino[] already [had] information that there was a dog in the apartment on December 12, 2017." [*Id.*] He claims that his pit bull's death could have been avoided "on two occasions: (1) in the entry plan. (2) they could have allowed me to put my dog in another location." [*Id.*] He states that "if there been a non[-]lethal plan my dog would be alive today, instead of making a[n] unreasonable plan to uphold the law." [*Id.*]

Plaintiff's argument, which speaks to whether the shooting was avoidable, finds support in the Ninth Circuit's decision in *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962 (9th Cir. 2005).[4] In that case, the Ninth Circuit stated that the Fourth Amendment forbids the killing of a person's dog when that destruction is unnecessary—that is, when less intrusive, or less destructive, alternatives exist. *Id.* at 978 ("A reasonable officer should have known that to create a plan to enter the perimeter of a person's property, knowing all the while about the presence of dogs on the property, without considering a method for subduing the dogs besides killing them, would violate the Fourth Amendment."). The officers in *Hells Angels* spent one week planning their entry of multiple residences of members of the Hells Angels

---

[4] Plaintiff's argument alludes to the holding in *Hells Angels* and he cites to this case, among others, in the concluding portion of his affidavit. [*See* 52 at pg. 5.]

pursuant to high-risk search warrants, and were aware of the presence of aggressive dogs on the properties. *Id.* at 977. In that case, the Ninth Circuit found the officers could not use safety as a justification for shooting the dogs they encountered on the properties in light of the fact that the officers had time to prepare a less intrusive means of protecting themselves from the dogs. *Id.*

However, *Hells Angels* is distinguishable from the instant case, and the Court is unpersuaded by Plaintiff's argument that the shooting of the pit bull was avoidable here. In this case, the deputies, unlike those in *Hell's Angels*, had a relatively short period of time to plan the search; Deputy Abate obtained the search warrant on December 11, 2017 and it was executed the following day. Based on the information Deputy Abate learned from a confidential informant, he suspected – but did not know for certain – that there was a "vicious pit bull" on the premises that was being used as a "guard dog." Based on this information, Deputy Marino was assigned a Sheriff's Department-issued shotgun for the entry in the event the pit bull posed an immediate danger to him or other members of the Narcotics Unit. When the deputies arrived at Plaintiff's apartment, they knocked and announced and received no response. The deputies knocked and announced a second time, and still received no response. After the second time, they knocked-down the door. The manner in which the deputies entered the home (breaking down the door after having twice knocked-and-announced and receiving no response), coupled with the fact that Plaintiff was unaware of where the dog was located at the time of the initial entry, undermines his contention that the deputies should have permitted him to secure his dog upon their initial entry.

Further, Deputy Marino did not immediately shoot the dog when he first encountered it in the apartment, and there is nothing before this Court that suggests that the shooting could have been avoided at any point between the initial entry and the time the shots were fired. Defendants have produced evidence showing that Deputy Marino was the first deputy in the house, that he proceeded to the south bedroom (where the pit bull was located at the time of the shooting), and that he did so for a legitimate reason (to conduct a security sweep). It was only at the point when the Deputy moved to the south bedroom to conduct his security sweep and the pit bull became aggressive toward him (barking, closing-in and lunging at him) that the Deputy fired the shots. Notably, the shooting in this case – which occurred in the course of Deputy Marino's initial security sweep of the premises, while events were quickly unfolding, and while the pit bull was unsecured and in close physical proximity to Deputy Marino – is dissimilar from the shootings in *Hells Angels* in which two dogs were shot from behind a gate (so that officers could gain entry to the residence) and a third dog was shot in a backyard (after the officers had already cleared the residence itself), *see Hell's Angels*, 402 F.3d at 968-9.

Accordingly, for the reasons stated above, the Court finds that Defendants[5] are entitled to summary judgment on Plaintiff's Fourth Amendment claim related to the seizure of the dog.

---

[5] The parties do not dispute that Deputy Marino (rather than Deputy Abate) shot the dog during the search. To the extent, however, that Deputy Abate was involved in securing the search warrant (and was responsible for deciding not to involve Animal Services in the search), the Court finds that summary judgment is warranted for both Defendants.

**IV.     Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment [43] is granted. Plaintiff's Fourth Amendment claim is dismissed with prejudice. Given that there are no remaining claims or Defendants in this action, the case is dismissed in its entirety. Final judgment shall enter.

If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). If the appeal is found to be non-meritorious, Plaintiff could be assessed a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he is in imminent danger of serious physical injury. *Ibid.* If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1).

Plaintiff need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Plaintiff wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. See Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

Date:   September 30, 2020          By:   _____
                                          Iain D. Johnston
                                          United States District Judge